Of Counsel:

Dean N. Panos (*pro hac vice*)
Richard P. Steinken (*pro hac vice*)
Philip L. Harris (*pro hac vice*)
JENNER & BLOCK LLP
330 North Wabash Avenue
Chicago, Illinois 60611-7603
Tel: (312) 923-2765
Fax: (312) 840-7765

Kevin H. Marino
John D. Tortorella
MARINO, TORTORELLA & BOYLE, P.C.`
437 Southern Boulevard
Chatham, New Jersey 07928-1488
Tel: (973) 824-9300
Fax: (973) 824-8425

*Counsel for Defendant Kraft Foods, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN O'DONNELL, RUTHANN HILLAND, and MICHELE DE SCISCIOLO for themselves and a class of consumers similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>KRAFT FOODS, INC., manufacturer of the Oscar Mayer brand; SARA LEE CORPORATION, manufacturer of the Ball Park brand; CONAGRA FOODS, INC., manufacturer of the Hebrew National brand; NATHAN'S FAMOUS, INC., manufacturer of the Nathan's Famous brand; and MARATHON ENTERPRISES, INC., manufacturer of the Sabrett brand,<br><br>Defendants. | Hon. Jose L. Linares, U.S.D.J.<br><br>Civil Action No. 09 Civ. 04448 (JLL-CCC)<br><br><br>**CERTIFICATION OF JOHN D. TORTORELLA IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE COMPLAINT** |

JOHN D. TORTORELLA, of full age, certifies and states:

1.      I am an attorney at law in the State of New Jersey, and a member of the firm of

Marino, Tortorella & Boyle, P.C., attorneys for Defendant Kraft Foods, Inc. ("Kraft"). I submit

this Certification in support of Defendants' joint Motion to Dismiss the Complaint.

2.      Attached as Exhibit 1 is a true and correct copy of an order entered by Hon. Jamie D. Happas, dismissing the complaint in DeBenedetto v. Denny's, Inc., MID-L-6259-09 (N.J. Super. Law Div.) without prejudice on November 10, 2009.

3.      Attached as Exhibit 2 is a true and correct copy of the transcript containing Judge Happas's opinion in DeBenedetto v. Denny's, Inc., MID-L-6259-09 (N.J. Super. Law Div. Nov. 10, 2009).

I certify under penalty of perjury, pursuant to 28 U.S.C. § 1746(2), that the foregoing is true and correct.


Dated: November 24, 2009                                   _____

                                                                             JOHN D. TORTORELLA

# EXHIBIT 1

**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
Morristown, NJ 07962-1997
(973) 538-4006
Attorneys for Defendant Denny's, Inc.

**FILED**

**NOV 1 0 2009**

**Judge Jamie D. Happas**

---

NICK DeBENEDETTO on behalf
of himself and those similarly situated,

   Plaintiff(s),

  v.

DENNY'S, INC.,

   Defendant.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: MIDDLESEX COUNTY

DOCKET NO.: MID-L-6259-09
CIVIL ACTION

**ORDER DISMISSING PLAINTIFF'S
COMPLAINT WITH PREJUDICE**

---

THIS MATTER having been opened to the Court upon application by Porzio, Bromberg & Newman, P.C., attorneys for the Defendant, Denny's, Inc., and the Court having read and reviewed the moving papers submitted and any opposition thereto and for good cause having been shown;

It is on this   10   day of   Nov.   , 2009,

ORDERED that the motion of Defendant, Denny's, Inc., to dismiss is hereby granted; and it is

FURTHER ORDERED that Plaintiff's Complaint is hereby dismissed with prejudice.

A copy of the within Order shall be served upon all counsel within ____7____ days from the date of entry.

_____
JAMIE D. HAPPAS J.S.C.    J.S.C.

*For the reasons set forth on the record*

1310712

☐ The court made the attached findings of fact or reasons for its decision on
_____

☐ The court set forth its findings of fact or reasons for its decision orally on
the record on _____

This Motion was:

☒ Opposed

☐ Unopposed

On this date, pursuant to R. 1:6-2
The court's statement of reasons
have been set forth on the record.

2

# EXHIBIT 2

```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION, CIVIL PART
                              MIDDLESEX COUNTY
                              DOCKET NO. L-6259-09
                              APP. DIV. NO.  _____
```

DeBENEDETTO,                         :

              Plaintiff,       :

  vs.                                :       TRANSCRIPT
                                  OF

DENNY'S,                             :       MOTION

              Defendant.       :

```
              Place:   Middlesex County Courthouse
                       56 Paterson Street
                       New Brunswick, NJ 08903

              Date:    November 10, 2009
```

B E F O R E:

    HONORABLE JAMIE D. HAPPAS, J.S.C.

T R A N S C R I P T   O R D E R E D   B Y:

    LAUREN E. HANDLER, ESQ., (Porzio, Bromberg, and
    Newman, PC, PO Box 1997, 100 Southgate Parkway,
    Morristown, New Jersey  07960-6441)

A P P E A R A N C E S:

    ANDREW R. WOLF, ESQ., (Galex Wolf, LLC)
    HENRY P. WOLFE, ESQ., (Galex Wolf, LLC)
    MICHAEL QUIRK, ESQ.,
    Attorneys for the Plaintiff

    LAUREN E. HANDLER, ESQ., (Porzio, Bromberg, and
    Newman, PC)
    JANE THORPE, ESQ., (Alston and Bird, LLP)
    Attorneys for Defendant

```
              Transcriber:  Susan M. Cawley,
                            AD/T #427

              Agency:       KLJ Transcription Svc
                            Service, LLC
                            PO Box 8627
                            Saddle Brook, NJ 07663
                            (201) 703-1670
                            (201) 703-5623 (fax)

                            Audio Recorded
                            Operator:  E. Gosthawski
```

2

1                I N D E X

2

3

4    THE COURT

5

6    Case History                                   4

7

8

9    MOTION

10

11   BY:  Mr. Wolf                         13, 48

12   BY:  Ms. Thorpe                      45

13

14

15   THE COURT

16

17   Decision                                  52

18

19

20

21

22

23

24

25

Colloquy                                          3

1             (Matter commences, 1:30 p.m.)

2         THE COURT:  Good afternoon.

3         MS. HANDLER:  Good afternoon.

4         MR. WOLF:  Good afternoon, Judge.

5         THE COURT:  Everybody's on time, this is

6   great.  Okay.  This is DeBENEDETTO VS. DENNY'S, enter

7   your appearance, please.

8         MS. THORPE:  Jane Thorpe for Denny's, Your

9   Honor.

10        MS. HANDLER:  Lauren Handler; Porzio,

11  Bromberg, and Newman, for Denny's.

12        MR. WOLF:  Good afternoon, Your Honor, Andrew

13  Wolf from Galax Wolf on behalf of DeBenedetto.  I'd

14  like to introduce to the Court Michael Quirk

15  (phonetic), --

16        THE COURT:  Very good.

17        MR. WOLF:  -- from Pennsylvania, who was just

18  admitted pro hac --

19        THE COURT:  Very good.

20        MR. WOLF:  -- by Your Honor.

21        THE COURT:  Nice to see you, Mr. Quirk.

22        MR. WOLF:  And another associate from my

23  firm, Henry Wolfe, is here.

24        THE COURT:  Okay.  Very good.  This is Wolfe

25  but not related, right?

Colloquy / The Court - Case History                              4

```
 1              MR. WOLF:  Right.  Different spelling.
 2              THE COURT:  Yes.
 3              MR. WOLF:  Well, he's -- I still have to sign
 4    things, like his paycheck, but.
 5              THE COURT:  Oh, okay.  Maybe that's -- maybe
 6    that's why he's seated in the back, right?
 7              MR. WOLFE:  He gives me my allowance.
 8              THE COURT:  There you go.  All right.  Let me
 9    -- how I normally hear the motions, and I know -- I'm
10    not sure, Mr. Wolf, if you -- you've had motions before
11    me.
12              MR. WOLF:  No, I've had case management --
13              THE COURT:  No.  Case management.
14              MR. WOLF:  -- settlement conference, --
15              THE COURT:  Okay.  What I --
16              MR. WOLF:  -- not a motion.
17              THE COURT:  -- normally do is, I place on the
18    record the facts, as I glean them to be, from reading
19    -- excuse me, from reading the papers, I then have some
20    questions, and I'll let you all argue, and we can do
21    our thing.
22              All right.  July 22nd, 2009, plaintiff, Nick
23    DeBenedetto filed a class action lawsuit against
24    Denny's, alleging that defendant violated the New
25    Jersey Consumer Fraud Act in breaching implied warranty
```

The Court - Case History                                         5

```
 1    of merchantability by serving meals containing large
 2    and undisclosed amounts of sodium.
 3              Specifically, plaintiff claims that Denny's
 4    engaged in deceptive and unconscionable commercial
 5    practice in its sales of meals containing alarmingly
 6    large and undisclosed amounts of sodium.  Plaintiff
 7    further alleges that he was a customer at Denny's for
 8    10 to 20 years and ate at Denny's approximately 10
 9    times -- 10 times in 12 months before filing this
10    complaint.
11              Plaintiff alleges an ascertainable loss equal
12    to the amount of money he spent on meals containing
13    high and undisclosed sodium content.
14              Defendant Denny's now moves to dismiss the
15    complaint, contending that -- contending that plaintiff
16    has failed to state the claim on -- on which relief can
17    be granted.
18              The movant's argument, in summary, is
19    defendant argues that plaintiff's complaint fails
20    because New Jersey's Product's Liability Act provides
21    the exclusive cause of action for plaintiffs, who, like
22    plaintiff, have a claim on an allegedly defective
23    product.
24              Moreover, because plaintiff is not alleging
25    physical harm, as required by the PLA, his suit fails
```

```
 1    in its entirety.  Further, plaintiff's action under the
 2    Consumer Fraud Act and implied warranty claim are
 3    equally deficient, even assuming those apply here.
 4           With respect to the CFA, which is the
 5    Consumer Fraud Act, plaintiff cannot establish that
 6    Denny's engaged in unlawful conduct by failing to
 7    disclose an open and obvious condition of its food.
 8           And plaintiff's theory of ascertainable loss,
 9    the purchase price of his meals, fails, because
10    plaintiff received and consumed exactly what was
11    promised.  Having failed to allege that he made any
12    effort to, actually, learn the sodium content of
13    Denny's food, the information which was available on
14    Denny's website.
15           Plaintiff fails to establish the causal link
16    between the alleged unlawful conduct and the
17    ascertainable loss required to state a claim under the
18    CFA.
19           For similar reasons, plaintiff's claim fails
20    -- plaintiff fails to state a claim for breach of
21    implied warranty of merchantability, which requires not
22    only that the food be fit for ordinary purposes --
23    which requires only that the food be fit for ordinary
24    purposes.
25           Having alleged that he returned to Denny's
```

```
 1    ten times within a year, plaintiff cannot reasonably
 2    claim that Denny's food was not fit for ordinary
 3    purposes.  Accordingly, Denny's moves to dismiss
 4    plaintiff's complaint for failure to state a claim upon
 5    which relief can be granted.
 6           The plaintiff believes the restaurant should
 7    be required to lower the sodium content of their foods
 8    or print some type of notice to customers about sodium.
 9    The remedy is in the legislature and not the courts.
10           The Court received opposition and the
11    opposition, in summary, sets forth that plaintiff
12    agrees with defendant, that this lawsuit was not an
13    effort to recover damages for injuries.  Rather, it's
14    an effort to enjoin defendant's unlawful practice of
15    concealing the astronomical amounts of salt in many of
16    its meals from customers at the point of purchase.
17           This is why plaintiff sued defendant under
18    the CFA for individual refund and class-wide injunctive
19    relief.  The PLA has nothing to do with this case and
20    Denny's argument that the PLA subsumes or preempts
21    plaintiff's claims is a legally baseless ruse designed
22    to strip consumers of their legal rights and remedies,
23    while allowing Denny's and other purveyors of
24    marketable food products to continue their unlawful
25    conduct, concealing material information about these
```

The Court - Case History                                    8

1     products from consumers at the point of sale.
2             Further, defendant's admitted complaint
3     alleges sufficient facts to make out a prima facie case
4     under the CFA.  Specifically, plaintiff has
5     sufficiently pled unlawful practices, ascertainable
6     loss, and causation with respect to the first prong of
7     the types of unlawful practices recognized under the
8     CFA.  Only knowing admissions require the consumer to
9     completely establish intent.
10            By contrast, CFA regulatory and supplemented
11    provisions prescribe a specific conduct, a per se
12    unlawful practices.  The amended complaint easily
13    establishes unlawful practices by Denny's, including
14    unlawful practices that violate CFA regulatory
15    provisions.
16            With respect to the second prong,
17    ascertainable loss, the complaint does -- does specify
18    an ascertainable loss in the amount of money that
19    plaintiff paid for meals at Denny's.  The purchase of
20    which were induced by Denny's unlawful practices of
21    concealment.  The purchase price of goods is a
22    proximate measure of loss when a consumer, as the
23    result of the seller's unlawful practice, received
24    something different from what he bargained, and thus,
25    never actually gets what he bargained for.


The Court - Case History                                    9

1             Finally -- finally, with respect to
2     causation, the amended complaint alleges that, "Mr.
3     DeBenedetto would not have purchased Moons over My
4     Hammy or any other high sodium meal if the menus had
5     clearly stated the sodium content."  The law is clear
6     that this satisfies a plaintiff's pleading requirement
7     for the third element of a CFA cause of action.
8             In addition, plaintiff contends that Denny's
9     breached the implied warranty of merchantability,
10    because its meals are prepared with excessive amounts
11    of sodium and are not adequately described on the menu
12    as to advise plaintiff and the New Jersey consumers
13    that they are consuming high amounts of sodium in one
14    meal, that are in excess of the advised daily limit.
15            Denny's meals are not fit to be consumed,
16    based on expert's conclusions, including that of the
17    American Heart Association, American Stroke
18    Association, Centers for Disease Control and
19    Prevention, National Academy of Science, National
20    Institutes of Health, US Department of Health and Human
21    Services, and US Department of Agriculture.
22            The high amounts of sodium in foods, such as
23    the high amounts of sodium in Denny's meals, can lead
24    to hypertension.
25            Moreover, plaintiff -- moreover, plaintiff

```
 1        discredits defendant's characterization their food is
 2        merchantable, but is palatable, it causes no immediate
 3        harm.  Not everyone exposed to a contaminant will
 4        suffer from it, but that does not excuse contamination.
 5             Ultimately, the high sodium content in
 6        Denny's food renders defendant's meals unmerchantable,
 7        because they are not of fair and average quality, not
 8        fit for ordinary purpose of human consumption, and not
 9        adequately described on menus to advise plaintiff and
10        New Jersey consumers that the meals contain high --
11        high levels of sodium.
12             The Court received a reply.  Plaintiff's
13        response in opposition to defendant's motion to dismiss
14        failed to overcome the settled law that both New Jersey
15        and courts in other jurisdiction facing similar claims
16        that require the dismissal is, actually, its entirety.
17             The reply also sets forth that plaintiff's
18        reiteration of large portions of the complaint cannot
19        change the fact that his theory of liability is
20        fundamentally a product's liability action, because the
21        alleged economic harm arises entirely from the
22        potential for personal, physical illness, he suggests,
23        could result from his consumption of the product at
24        issue, food purchased at Denny's.
25             In New Jersey, product's liability actions
```

```
 1        must be brought pursuant to the PLA, as the PLA
 2        subsumes product's liability claims purportedly brought
 3        pursuant to the CFA.  The PLA requires physical harm,
 4        which plaintiff, expressly, disavowed.  So both of his
 5        claims should be dismissed for failure to state a
 6        claim.
 7             With respect to the CFA, plaintiff simply
 8        ignores the multiple cases dismissing similar claims
 9        based on the open and obvious fact that various types
10        of food are potentially unhealthy to the people
11        consuming them.
12             In this case, plaintiff does not dispute that
13        people are aware of the presence of sodium in food and,
14        in fact, admits to knowledge that it could affect his
15        health.  Instead, plaintiff argues that the widespread
16        commonsense knowledge about sodium knowledge, plaintiff
17        does not dispute.  Does not require the dismissal of
18        his claims.  It is, in essence, relevant to the
19        question of whether Denny's engaged in unlawful conduct
20        by withholding that very information.
21             Plaintiff, on the one hand, asked the Court
22        to ignore the public knowledge about sodium in food
23        when addressing the question of Denny's unlawful
24        conduct.  Where as, on the other hand, plaintiff bases
25        his claim of ascertainable loss on the public's
```

1   undefined reasonable expectations as to the sodium
2   content of Denny's food.
3              The plaintiff has not alleged any facts in
4   his complaint demonstrating that plaintiff or consumers
5   either, actually, believe that Denny's food adhere to
6   various recommendations regarding the sodium intake or
7   have some other reasonable basis for such relief.
8              For similar reasons, plaintiff has not stated
9   the breach of implied warranty of merchantability
10  claim, because that warranty merely requires that the
11  food be fit for ordinary purposes.  Having alleged that
12  he returned to Denny's 10 times within a year, and
13  visited Denny's for 10 to 20 years, plaintiff cannot
14  now reasonably claim that Denny's food was not fit for
15  ordinary purposes.
16             If I misstated something, thoroughly, I'd
17  suggest that you clarify the record, but before you
18  start to argue, let me ask some questions and then you
19  can argue whatever I may have missed.  There's no need
20  for you to reiterate what I've already set forth on the
21  record.  I've read the papers a couple times.  So
22  there's no need to reiterate what I've already read.
23  If you want to stress a point, that's fine.
24             But I've got a couple questions, first, for
25  the plaintiff.  Assuming -- and who's going to argue

1   the case?
2              MR. WOLF:  I will, Your Honor.
3              THE COURT:  Okay.  And that doesn't preclude
4   you if you want say something, I just don't want you
5   both arguing back and forth, then it's two against one.
6              MR. WOLFE:  Thank you, Your Honor.
7              THE COURT:  Assuming that you were alleging
8   an injury or increased risk of injury, I know that's
9   not what you're contending here, but let's assume, for
10  argument sake, that you agree, do you agree that the
11  implied warranty of merchantability would be subsumed
12  by the PLA, as well as the CFA claim?
13             MR. WOLF:  With that assumption, yes.  I --
14  I --
15             THE COURT:  And if you're more comfortable
16  sitting down, you can sit down.  I know --
17             MR. WOLF:  Well, that's -- I'm just -- I'm --
18  I'm used to standing up, especially --
19             THE COURT:  -- some lawyers want to stand,
20  but I don't mind you -- you can sit up and sit down,
21  whatever --
22             MR. WOLF:  -- the first time before a judge,
23  I --
24             THE COURT:  What -- whatever, but -- I know,
25  that's -- as I normally say, that's because Judge --

Wolf - Motion                                                14

```
 1              MR. WOLF:  Well, the --
 2              THE COURT:  -- Rodriguez is looking at you.
 3              MR. WOLF:  It -- it -- but that's an
 4   assumption.  And -- and just to -- to finish it, that
 5   -- that's not in our complaint.  We haven't alleged --
 6              THE COURT:  Oh, I know that.
 7              MR. WOLF:  And we --
 8              THE COURT:  And it's -- I'm just -- just
 9   assuming a fact you vehemently object to.
10              MR. WOLF:  Right.  And -- and we, actually,
11   read, you know, SINCLAIR, McDARBY, and that before we
12   filed.
13              THE COURT:  I'm sure you did.
14              MR. WOLF:  The -- so we -- we --
15              THE COURT:  I would hope that you did.
16              MR. WOLF:  And so we -- we're aware of the
17   pitfalls of a --
18              THE COURT:  Uh-huh.
19              MR. WOLF:  -- PLA action and we're also aware
20   that the Consumer Fraud Act has specific provisions
21   that prescribe this type of conduct.  There's a Truth
22   in Menu Act provision.  There -- and --
23              THE COURT:  Uh-huh.
24              MR. WOLF:  -- so that's what we pled on.
25              THE COURT:  Okay.  Now, do you agree or
```

Wolf - Motion                                                15

```
 1   disagree -- or do you agree that if Mr. DeBenedetto
 2   were to continue to eat at Denny's, with no knowledge
 3   of the sodium intake, because nothing was posted,
 4   although I know there's an allegation it's posted in --
 5   it's not an allegation, I went on the website to see
 6   that it is posted, but do you agree that if Mr.
 7   DeBenedetto were to continue to eat at Denny's with no
 8   knowledge of the sodium intake, that this could,
 9   ultimately, impact on his hypertension and high blood
10   pressure condition?
11              MR. WOLF:  I -- I -- I can't agree with that,
12   because --
13              THE COURT:  You can't agree.
14              MR. WOLF:  I -- well, I -- I don't know.
15              THE COURT:  I just didn't hear you, no, I
16   didn't.
17              MR. WOLF:  I -- I can't agree with that
18   statement as --
19              THE COURT:  You can or you can't.
20              MR. WOLF:  Cannot.
21              THE COURT:  Okay.
22              MR. WOLF:  Because I'm not sure that that has
23   any impact on -- I mean, he has -- I don't know if he
24   goes home and drinks four gallons of water.  That's not
25   the point --
```

Wolf - Motion                                    16

```
 1                THE COURT:  Well --
 2                MR. WOLF:  -- of our case.  It may, at some
 3      point, have an impact on his health, it may not.  It's
 4      not a part of his cause of action, --
 5                THE COURT:  Well --
 6                MR. WOLF:  -- it's not part of his claims.
 7                THE COURT:  Well, the complaint -- do you
 8      agree -- would you agree that he's aware that he should
 9      be on a low sodium diet?
10                MR. WOLF:  We are aware that he, personally,
11      has knowledge of the fact that he --
12                THE COURT:  So the answer's yes or no.
13                MR. WOLF:  Yes, --
14                THE COURT:  Okay.
15                MR. WOLF:  -- to that question only.
16                THE COURT:  Are you aware that -- that he
17      watches his salt intake?
18                MR. WOLF:  Yes, we are aware of that, Your
19      Honor.
20                THE COURT:  And are you aware that he looks
21      for low sodium menu items --
22                MR. WOLF:  I -- I believe we pled that.
23                THE COURT:  Let me finish my --
24                MR. WOLF:  Sorry, Your Honor.
25                THE COURT:  -- let me finish my -- my
```

Wolf - Motion                                    17

```
 1      statement.  Are you aware that he looks for low sodium
 2      menu items when eating at restaurants?
 3                MR. WOLF:  I'm not sure if we pled it exactly
 4      that way, Your Honor, but I believe he -- he doesn't
 5      use salt on his food and he -- what he -- when there is
 6      information, he buys lower or less --
 7                THE COURT:  You pled it --
 8                MR. WOLF:  -- sodium.
 9                THE COURT:  -- that way, because --
10                MR. WOLF:  Right.
11                THE COURT:  -- that's where I got it from.
12                MR. WOLF:  Okay.
13                THE COURT:  So I didn't make it up.
14                MR. WOLF:  Okay.  Yes.
15                THE COURT:  So we can -- we can assume all of
16      those things, because that's in your pleading, correct?
17                MR. WOLF:  Right.
18                THE COURT:  How can you then assert that
19      plaintiff's claims do not involve a risk of injury?
20                MR. WOLF:  He hasn't alleged any risk of
21      injury --
22                THE COURT:  But given what you've --
23                MR. WOLF:  -- and he's not looking for --
24                THE COURT:  -- set forth in your complaint,
25      how could you then assert that although you didn't --
```

Wolf - Motion                                    18

```
 1    you didn't plead it, okay, but making and setting forth
 2    those contentions and allegations in your complaint,
 3    how could you then set forth before this Court that
 4    plaintiff's claims had nothing to do, when they're not
 5    involved with any risk of injury?
 6              MR. WOLF:  Because that's -- I -- our
 7    understanding of the law and the Consumer Fraud Act and
 8    the specific Truth and Menu provisions are that there's
 9    an obligation under 56:8-2.9, 10, and 11, for the
10    defendant to have put forth on their menus.  So the
11    fact that -- that's -- our claim is, purely, an
12    economic claim.  Whether --
13              THE COURT:  I understand that.
14              MR. WOLF:  -- or not he has risk or injury --
15              THE COURT:  I understand that, but we have to
16    take a look at the law.  Your -- your -- as it's set
17    out, you state that it's just economic loss.  Okay.
18    But if you -- what I -- what I need to do, when I look
19    at a complaint, and in the future we can attach
20    complaints, because I've gotten a lot of motions
21    dismissed, but -- but complaints aren't attached, but I
22    got the complaint.  That's totally on point.  So I --
23    it was easy for me to get.  Not so easy sometimes when
24    it's not my file, but I have the complaint and it's my
25    duty to go through the complaint with a fine tooth comb
```

Wolf - Motion                                    19

```
 1    and to ascertain whether it does state a cause of
 2    action.
 3              Now, my concern, at least, is that you -- you
 4    have a whole section in your complaint and you tell me
 5    a little bit about Mr. DeBendetto (sic) -- DeBenedetto,
 6    and you tell me about the facts about him, and I set
 7    forth some of those things on the record, but in your
 8    argument, you state that these claims have nothing to
 9    do with any involvement with risk of injury, correct?
10              MR. WOLF:  That's correct, Your Honor, and --
11    and they -- the -- the information about sodium and
12    about Mr. DeBenedetto's individual claims, those are
13    background facts.  They're not the allegations.
14              Now, if -- if you think that those are
15    important to the pleading, then we can re-plead it and
16    take those out, because they're not part of our claim,
17    they were just there to give everybody, defendants,
18    everybody background on the claim, but I think it's
19    important --
20              THE COURT:  Okay.  Let me ask my questions,
21    and then you can argue anything you want.
22              MR. WOLF:  All right.
23              THE COURT:  Let me get through so I can
24    have --
25              MR. WOLF:  Okay.
```

1           THE COURT:  -- a good understanding.  Does
2    the consumption of Denny's meals with the alleged, and
3    I'm using the word astronomical, because that's -- I
4    either got it from your complaint or your opposition,
5    but does the consumption of Denny's meal with the
6    alleged astronomical sodium content, have any physical
7    appect (sic) upon -- any physical affect upon the
8    plaintiff or those similarly situated?
9           MR. WOLF:  Not to my knowledge that it has an
10   affect.
11          THE COURT:  Then why do you then argue that
12   -- and I set forth in your -- my recitation of your
13   opposition, that there was all those different
14   organizations that say that high sodium intake could
15   affect -- could affect somebody?
16          MR. WOLF:  Those are potential harms, which
17   we believe, based on the high sodium contact (sic) in
18   Denny's foods, would require them, under the Consumer
19   Fraud Act, the Truth in Menu provisions, to disclose
20   that information so that people would have a choice on
21   whether or not to purchase those items, based on their
22   own personal knowledge of preferences.
23          THE COURT:  So you're contending that
24   plaintiff's CFA claim is based purely on economic
25   losses.  Is that correct?

1           MR. WOLF:  That is correct, Your Honor.
2           THE COURT:  And does the fact that the
3    federal government is now dealing with this issue of
4    posting ingredients in food, does that, in any way,
5    preempt this Court from dealing with this issue?
6           MR. WOLF:  No, Your Honor.
7           THE COURT:  Why?
8           MR. WOLF:  Well -- well, what if -- if you're
9    talking about the federal --
10          THE COURT:  I'm -- I'm -- specifically, I did
11   some research and there's two -- there's, actually, two
12   bills that are -- that are pending in Washington.  One,
13   I think, is the Meal -- the Meal Act, and there's
14   another one that, specifically, deals with the posting
15   of ingredients, including sodium.
16          MR. WOLF:  Well, at this point in time, there
17   are bills pending in Congress and -- and I -- I'm not
18   100 percent, I know there was some references to some
19   pending legislation or on past legislation in Denny's
20   papers, but the fact that there's no law, specifically,
21   preempting or in place at this time, would not prevent
22   us from proceeding with this claim at this time.
23          If there's a preemption and then there's a
24   retroactive --if -- if -- if a statute was, ultimately,
25   passed or a regulation, generally, they have

1     perspective applicability and then we could deal with
2     whether or not there's a retroactive applicability of
3     that, but as I know now, there's no -- no statute or
4     regulation in place that --
5               THE COURT:  Are you aware of --
6               MR. WOLF:  -- deals with that.
7               THE COURT:  -- those bills that are pending
8     in DC?
9               MR. WOLF:  I, personally, am not.  Some of my
10    co-counsel might be aware of them.
11              THE COURT:  Are you aware of them?
12              MR. QUIRK:  It might be torturing the
13    definition of awareness to say yes, but I -- yeah, I
14    saw something in the paper about something connected
15    with one of the -- possibly connected with the health
16    care legislation.
17              THE COURT:  Wouldn't it be important to know
18    that stuff?  I -- I -- I was curious --
19              MR. WOLF:  Well --
20              THE COURT:  -- to know whether or not there
21    was anything pending, because we all know what's going
22    on in California, in New York, in the various states.
23    And then when I found out and I dug a little bit
24    deeper, I found that there was, actually, two bills
25    pending in -- in -- in Washington, and they're getting

1     a little bit closer in terms of whether or not that
2     they're going to pass or -- or not pass, but that's
3     okay, that's -- that's neither here nor there.  We
4     don't have --
5               MR. WOLF:  They're not --
6               THE COURT:  -- we don't have to get hung up
7     on that.
8               MR. WOLF:  Yeah.
9               THE COURT:  What was the unlawful conduct
10    here?
11              MR. WOLF:  The --
12              THE COURT:  Know -- knowing that there's --
13    there's legislation -- federal legislation now out
14    there, knowing that there's nothing in New Jersey that
15    says that you have to post the sodium content in menus.
16    What's the unlawful conduct?
17              MR. WOLF:  Well, Your Honor, actually, this
18    -- the fact that there's no specific legislation or law
19    in New Jersey that says you have to post calories or
20    salt on a menu, is not the question.  The question is
21    that -- and one of the reasons why those laws might not
22    have passed, is because the Consumer Fraud Act,
23    actually, covers that.
24              The -- the Consumer Fraud Act has a Truth in
25    Menu provision that requires to put things that are

Wolf - Motion                                    24

1   truthful on the menu and not to omit things that you
2   know that are misrepresentations.
3               THE COURT:  But you, actually, have
4   something, I think, that's in your complaint or some --
5   something that was cited -- one of those articles that
6   were cited, that -- really, that -- that -- that tells
7   us that restaurants are, actually, exempt from doing --
8   from --
9               MR. WOLF:  Well --
10              THE COURT:  -- from certain aspects of,
11  actually, posting.
12              MR. WOLF:  Well, that's not true, Your Honor.
13  I -- I think there's, like, New York has a -- a fast
14  food law, something that requires them to do it, but
15  the law in New Jersey, as far as I understand it, is
16  very clear, 56:8-2.9, N.J.S.A., certainly, says that it
17  shall be an unlawful practice for any person to
18  misrepresent on any menu or posted information,
19  including advertisements, the identity of any food or
20  food products to any of the patrons or customers of
21  eating establish (sic), including, but not limited to
22  restaurants, hotels, cafes, lunch counters, and other
23  places where food is regularly prepared and sold for
24  consumption, on or off premises.  So it doesn't apply
25  to retail foods.

Wolf - Motion                                    25

1               And then the next section of that statute,
2   which is 56:8-2.10 defines what a misrepresentation is.
3   The identity of such food or food products shall be
4   deemed misrepresented if A, its description is false or
5   misleading in any particular, but more importantly, B,
6   its description omits information, which by its
7   omission, renders the description false or maleading
8   (sic) -- misleading in any particular.
9               And our claim is that the fact that they know
10  that they have this high sodium content in their food
11  and they don't advise people of it, is a omission and a
12  misrepresentation by law, under this statute.  And that
13  there's -- we don't need to go any further, we don't
14  need to look at intent or anything else, that this is
15  pure --
16              THE COURT:  So the statute --
17              MR. WOLF:  -- statutory claim.
18              THE COURT:  -- that you cite, you state that
19  that requires Denny (sic) to identify -- Denny's, as
20  well as every single fast food restaurant, as well as
21  every single restaurant that -- that anyone eats at in
22  New Jersey, to identify the sodium content of its food
23  on its menu.
24              MR. WOLF:  No, Your Honor, --
25              THE COURT:  Okay.  Then --

Wolf - Motion                                        26

1       MR. WOLF:  -- that's not my argument.
2       THE COURT:  -- what's your argument?
3       MR. WOLF:  My argument is -- is, if it's so
4   outside of what expectations and the norm is, like, if
5   you go -- if I go to every --
6       THE COURT:  Who's going to determine what's
7   outside the expectations, --
8       MR. WOLF:  Well, --
9       THE COURT:  -- me?
10      MR. WOLF:  -- there's standards out there.
11      THE COURT:  Me.
12      MR. WOLF:  Well -- not on -- this is a motion
13  to dismiss, it's not --
14      THE COURT:  Oh, I know, --
15      MR. WOLF:  -- summary judgment.
16      THE COURT:  -- but I'm curious, who --
17      MR. WOLF:  All right.  What -- what --
18      THE COURT:  -- whose -- whose going to be
19  asked to decide that?
20      MR. WOLF:  Well, when -- when the -- it's --
21  every -- it's funny that you ask that question, because
22  I -- I had the same thought as Your Honor.
23      THE COURT:  Well, there you go.
24      MR. WOLF:  Okay.  And -- and here's what I
25  did, is I -- I went -- you know, every bagel place,

Wolf - Motion                                        27

1   every breakfast place in New Jersey, and New Jersey is
2   famous for pork roll, egg, and cheese on a roll, right.
3   Did -- and every place serves a ham, egg, and cheese
4   sandwich, but my expectations and about the 50 people
5   that I spoke to over the last few weeks, when I said,
6   when you go in and you order that ham, egg, and cheese
7   sandwich at the local bagel store or the deli or the
8   coffee shop, and you eat it, what are your
9   expectations?
10      He goes, well, I know I'm probably not eating
11  the best breakfast that I can, but I watch myself.  And
12  what if I told -- you know, and you talk to the
13  proprietors, no we just use regular slice of ham and
14  cheese.  Well, there's probably about maybe 800, 900
15  milligrams of salt in our food.
16      You don't expect to have two and a half times
17  your daily allotment of salt in a product when the
18  person knows that it's in there.  And that's --
19      THE COURT:  Yeah, but any time you walk --
20      MR. WOLF:  -- what we're saying --
21      THE COURT:  -- outside of your house and you
22  walk into any restaurant or into any fast food, aren't
23  you taking it upon your own hands as to what you're
24  putting into your body?  That doesn't even matter.
25      MR. WOLF:  I -- I --

Wolf - Motion                              28

1         THE COURT:  You know what, --
2         MR. WOLF:  -- I don't think --
3         THE COURT:  -- don't even answer that,
4    because --
5         MR. WOLF:  Yeah.
6         THE COURT:  -- we're -- it doesn't matter, --
7         MR. WOLF:  And -- and --
8         THE COURT:  -- in terms of this motion, --
9         MR. WOLF:  Right, these -- these are --
10        THE COURT:  -- it doesn't matter.  We don't
11   have to get there.
12        MR. WOLF:  -- factual issues that we might
13   have to resolve --
14        THE COURT:  No, it just -- I'm just curious.
15        MR. WOLF:  -- in the case, yeah.  Yeah, but
16   -- but --
17        THE COURT:  There's no reason for us to even
18   get into it.
19        MR. WOLF:  -- but I -- I think that, you
20   know, the -- the issue is, really, one of -- of what
21   they know and what would render -- what's omitted from
22   their menu that they know.  They know, they have it
23   hidden on their website, you can't expect people to go
24   look at websites before they eat, they know that
25   they're foods have two, three, some four times the

Wolf - Motion                              29

1    daily recommendations for sodium.
2         THE COURT:  Okay.  I -- I understand that.
3         MR. WOLF:  And that's our argument that it's
4    misrepresentation.  Whether or not we succeed on the
5    merits of the case, that -- that's something that we
6    should find out later on.
7         THE COURT:  I understand that.  In fact, you
8    -- but there's a report, and I don't have the name
9    right here, but there is a report cited in your
10   complaint that notes that restaurants are exempt from
11   posting this information.
12        MR. WOLF:  I -- I --
13        THE COURT:  May -- maybe you can help me.
14        MS. HANDLER:  It's the Nutrition Education
15   Labeling Act, and it --
16        THE COURT:  Right, because I -- because I --
17        MS. HANDLER:  -- says we don't have to --
18        THE COURT:  Right.
19        MS. HANDLER:  -- to do it.  And I -- I have
20   the cite, Your Honor, which --
21        THE COURT:  Okay.  No, I just -- I -- I
22   thought I read that someplace.  It's -- it's -- it's in
23   their complaint.
24        Now, I mean, are you asking since -- I guess
25   -- are you asking the Court to create a -- a new

1      requirement then that all restaurants to close --
2      disclose sodium contact -- content in their menus,
3      which are higher than they should be?
4                   MR. WOLF:  I -- I don't think so, Your Honor.
5      I don't think --
6                   THE COURT:  But what are you asking -- what
7      are you asking --
8                   MR. WOLF:  We're asking, in this case, to
9      proceed on a case against Denny's, to show that they
10     knew that they had high sodium, that they had an
11     obligation, under New Jersey law, to -- to do that.
12     The -- the other cases before us or before the court,
13     we know, in this case, that Denny's was aware of their
14     high sodium content.  They were aware that they did it,
15     and that they -- they refused to put it on their menu,
16     and that there's a law that says if you know that
17     there's things that are going to affect people's
18     thought process in buying it, you have to tell people
19     about it.
20                  So it's the same thing as if --
21                  THE COURT:  But that would -- that would
22     affect every single fast food restaurant.  I mean, you
23     -- your -- you, yourself, just cited a couple of them.
24     I mean, I think you had McDonald's, you had a couple
25     other ones just --

1                   MR. WOLF:  Well --
2                   THE COURT:  -- cited in your complaint.
3                   MR. WOLF:  It -- it may have that affect, but
4      -- but that's the law.  I mean, we're -- all we're
5      doing is seeking to have the law of New Jersey apply to
6      Denny's at this point.  I'm not making a public policy,
7      it might have -- ultimately, have that affect, but --
8      but that -- that -- that ultimate issue, I don't think
9      is before --
10                  THE COURT:  And why -- and --
11                  MR. WOLF:  -- the Court.
12                  THE COURT:  -- and then what's the importance
13     of that?
14                  MR. WOLF:  Well -- well, let's --
15                  THE COURT:  What's the importance of -- of --
16     of bringing that to the Court to do -- to -- for that
17     reason?
18                  MR. WOLF:  Well --
19                  THE COURT:  What's the -- what's the
20     importance of bringing that to the Court's attention?
21                  MR. WOLF:  I'm -- I'm sorry, what -- because
22     we have a plaintiff that feels that he's been aggrieved
23     under the Consumer Fraud Act and he -- he, virtually,
24     says, I wouldn't buy this and they should have let me
25     know, and the law in New Jersey says it.

```
                         Wolf - Motion                      32

 1                   THE COURT:  And --
 2                   MR. WOLF:  Let -- let's say, for example --
 3                   THE COURT:  And why wouldn't he buy it?
 4                   MR. WOLF:  He, personally, would make a
 5      choice --
 6                   THE COURT:  Right.
 7                   MR. WOLF:  -- for probably many reasons.
 8                   THE COURT:  So what's some of the reasons?
 9                   MR. WOLF:  I don't know.  I -- personally,
10      me, I used to eat at Denny's, I won't eat there any
11      more.  Not --
12                   THE COURT:  Well --
13                   MR. WOLF:  -- I don't have a problem with my
14      salt --
15                   THE COURT:  He wouldn't eat there, because --
16      because of the health reasons, correct?
17                   MR. WOLF:  Well --
18                   THE COURT:  That's what you have in your --
19                   MR. WOLF:  That's one of --
20                   THE COURT:  -- complaint.
21                   MR. WOLF:  -- his reasons.
22                   THE COURT:  Yes, that's the --
23                   MR. WOLF:  He also just --
24                   THE COURT:  -- reason you have in your
25      complaint.  There's no --
```

```
                         Wolf - Motion                      33

 1                   MR. WOLF:  All right.  Well --
 2                   THE COURT:  -- other reason you have in your
 3      complaint, correct?  The harm that he would -- that he
 4      would sustain, because of consuming this, is the reason
 5      why he wouldn't eat it.  Is that fair?  Am I -- that's
 6      -- that's what I read from your complaint.
 7                   MR. WOLF:  I -- I -- I -- I think we gave
 8      that as background information.  He would make a
 9      personal choice not to eat that much sodium.  Whether
10      or not he would be harmed by it in the future, he's
11      been told to watch his salt intake, but I -- I'm not --
12      been told to do that, I watch my salt intake.
13                   THE COURT:  Do you dispute that the
14      consumptions of Denny meal -- Denny's meals can cause
15      physical harm to consumers?
16                   MR. WOLF:  Do I dispute that?
17                   THE COURT:  Yeah.
18                   MR. WOLF:  That there's a potential for that?
19                   THE COURT:  Yeah.
20                   MR. WOLF:  I -- I think there's -- the Court
21      can take judicial notice of all the reports that we
22      cited, that the high --
23                   THE COURT:  That's not my -- that's not my
24      question.  I'm not -- I'm not --
25                   MR. WOLF:  That --
```

1          THE COURT:  -- my question's not whether or
2   not I can take judicial notice.  My question is, do you
3   dispute that the consumption of Denny's meals can cause
4   physical harm to a consumer?
5          MR. WOLF:  Do I dispute that?
6          THE COURT:  Yeah.
7          MR. WOLF:  On a particular consumer that
8   might have a propensity towards problems --
9          THE COURT:  In -- in general.
10         MR. WOLF:  -- with salt intake --
11         THE COURT:  In general, if someone were to go
12  in there and eat My -- I can never get that right.
13         MR. QUIRK:  Moons over My Hammy.
14         THE COURT:  Moons over My Hammy, do you
15  dispute that that can have some type of physical
16  harm --
17         MR. WOLF:  I -- I -- I don't --
18         THE COURT:  -- if someone were to continually
19  eat that, without knowing the sodium content?
20         MR. WOLF:  I -- I --
21         THE COURT:  And given all the reports that
22  you've -- that you've cited in your complaint.
23         MR. WOLF:  I -- I -- I'm -- you know, I'd
24  have to think about that.  I -- I'm -- I want to be
25  frank with the Court, but I don't know if I dispute it

1   or not.  I know that under the law of New Jersey,
2   people are supposed to be given the choice on the menus
3   of what they --
4          THE COURT:  Okay.
5          MR. WOLF:  -- do consume.
6          THE COURT:  I understand that, but you're --
7   but --
8          MR. WOLF:  And -- and that -- that -- like my
9   father, when he sits down to eat a meal, and he's
10  supposed to watch his sodium in his own diet, he has
11  high blood pressure and he's 82 years old, he sits down
12  and the first thing he does, he picks up the salt
13  shaker and he shakes food on -- salt on his food before
14  he even tastes it -- tastes it.  And that's a personal
15  choice that he makes whether to listen to his doctor or
16  whether it's going to hurt him or not.
17         And I don't think that's -- that's not the
18  point of our case.  The point is, there might be some
19  potential harm, but the point is that this is about
20  purely economic marketing and -- and what are supposed
21  to be disclosed.  And the Consumer Fraud Act,
22  specifically, prescribes this behavior, that they -- if
23  they know things about their food, they're supposed to
24  disclose it on their menus.
25         And then the person has the choice whether to

1    consume it, whether he's going to die from it, whether
2    he's going to have a heart attack, whether he's going
3    to have to take three more high blood pressure pills.
4    That becomes a personal choice, but it's not what our
5    case is about.
6              THE COURT:  But why does your -- why -- why
7    do you then -- I mean, your opposition sets forth that
8    Denny's meals are not fit to be consumed, based on
9    experts' conclusions, including that of the American
10   Heart Association, American Stroke Association, Centers
11   for Disease Control and Prevention, National Academy of
12   Science, National Institutes of Health, US Department
13   of Health and Human Services, and US Department of
14   Agriculture.
15             The high amounts of sodium in foods, such as
16   the high amounts of sodium in Denny's meals, can lead
17   to hypertension.  That's what you're arguing.
18             MR. WOLF:  Well, that's --
19             THE COURT:  I -- I didn't get that -- I got
20   that either from your -- your --
21             MR. WOLF:  But -- oh -- that's in our
22   complaint, because it's background information and it's
23   not a part of our claims.  It's -- it's background
24   information.  It's not what we're pleading and it's not
25   what our case is about.

1              THE COURT:  Okay.
2              MR. WOLF:  And if you want us to re-plead the
3    case, --
4              THE COURT:  Well, let me just --
5              MR. WOLF:  -- which we're happy to do, and
6    take that out --
7              THE COURT:  If the consumption of Denny's
8    meals does not cause harm, would you still be entitled
9    to damages?
10             MR. WOLF:  Yes.
11             (Record remains on, no colloquy)
12             THE COURT:  Isn't the -- the central focus of
13   plaintiff's complaint that Denny's was aware of the
14   affects of high sodium in their food products, and they
15   refused to list the sodium content on its menu to warn
16   the consumers of that fact.  Is that true?
17             MR. WOLF:  I wouldn't word it the way that
18   you did, though.
19             THE COURT:  Well, I --
20             MR. WOLF:  That -- that's a product's
21   liability failure --
22             THE COURT:  Well --
23             MR. WOLF:  -- to warn type of argument, --
24             THE COURT:  No, it's not.  My question --
25             MR. WOLF:  -- which is not what we made.

Wolf - Motion                                    38

```
 1              THE COURT:  -- my question, and then I want
 2      you to tell me why my statement is wrong, and I'll read
 3      it again, and I -- and I'll -- I'll -- tell -- I'll ask
 4      you again, isn't the central focus of your complaint
 5      that Denny's was aware of the affects of high sodium in
 6      their food products and they refused to list the sodium
 7      content in its menu to warn customers of this fact.
 8              MR. WOLF:  No.
 9              THE COURT:  Okay.  How is that wrong?
10              MR. WOLF:  It's -- it's not about -- the --
11      the word warn wouldn't be in how I would phrase it.  It
12      would be a disclosure of something that's in their food
13      -- what I was trying to state before is, for example --
14              THE COURT:  Just tell me how that statement
15      is wrong.
16              MR. WOLF:  Because it's not about warning
17      them, it's about giving them notice of information
18      that --
19              THE COURT:  Giving notice is warning, --
20              MR. WOLF:  Well, no, warning --
21              THE COURT:  -- is it not?
22              MR. WOLF:  -- invokes physical --
23      conceptually, thinks about harm.  You --
24              THE COURT:  Okay.  So let's take it --
25              MR. WOLF:  -- warn somebody against harm.
```

Wolf - Motion                                    39

```
 1              THE COURT:  -- let's take that -- let's --
 2              MR. WOLF:  This is noticing of information.
 3              THE COURT:  Okay.  Good.  Let's take out the
 4      word warn.  Isn't the central focus of your complaint
 5      that Denny's was aware of the affects of high sodium
 6      in their food products and refused to list the sodium
 7      content on its menu, to give notice to customers of
 8      this fact?
 9              MR. WOLF:  No, I would take out affects.  I
10      -- our -- our complaint is about they're aware of the
11      high sodium content of their food and failure to tell
12      people that there is high sodium so that they could
13      decide whether or not they want to consume it.  It's
14      not about the affects --
15              THE COURT:  Well, then -- then I'm --
16              MR. WOLF:  -- and it's not about warning.
17              THE COURT:  -- really confused, because your
18      opposition says that Denny's meals are not fit to be
19      consumed, based on expert's conclusions.
20              MR. WOLF:  That's not under the Consumer
21      Fraud Act agreement, that's under the -- I -- I think
22      that's under the -- the implied warranty agreement, an
23      argument which Your Honor, I think, read, clearly
24      included the fact that they didn't give limiting notice
25      in their advertisements in selling of that.
```

Wolf - Motion                                                40

```
 1              Which is the main focus of our implied
 2     warranty is that they didn't include that information.
 3     Not that it was -- it wasn't fit to consume for the
 4     combination.  Had they told people that it had salt and
 5     that level of salt, then -- then we wouldn't have our
 6     Consumer Fraud Act claim or an implied warranty of --
 7     of merchantability claim, because it's based on that
 8     one component, that they didn't give them fair warning
 9     of -- of -- of the content of the sodium.
10              THE COURT:  In essence, what you're alleging
11     then is that Denny's failed to warn consumers of the
12     high sodium in its food, which it had knowledge,
13     resulting in economic harm to the plaintiff, correct?
14              MR. WOLF:  Yes, Your Honor.
15              THE COURT:  And do you agree or disagree that
16     plaintiff's complaint alleges that sodium is dangerous,
17     it causes one to -- an increased risk of injury?
18              MR. WOLF:  I -- I agree that we put that in
19     background information, but not to support his claims,
20     but to --
21              THE COURT:  That's not what I'm asking.  I'm
22     asking --
23              MR. WOLF:  Yes, that allegation is --
24              THE COURT:  -- do you -- do you agree?
25              MR. WOLF:  -- in the complaint.
```

Wolf - Motion                                                41

```
 1              THE COURT:  And do you agree or disagree that
 2     the classes are -- the classic articulation of tort law
 3     duties, that is to warn of or make safe, is squarely
 4     within the theories included in the PLA?  The Product's
 5     Liability Act.
 6              MR. WOLF:  The answer to your question, I
 7     think, is yes, but I don't think -- that's not what we
 8     pled here and --
 9              THE COURT:  Oh, I know it's not what you --
10              MR. WOLF:  -- what we're alleging.
11              THE COURT:  -- pled, but it's -- it's --
12              MR. WOLF:  That's not what we're asking for.
13              THE COURT:  -- it's -- but you agree -- but
14     you agree.
15              MR. WOLF:  I -- I believe that's true, Your
16     Honor.
17              THE COURT:  Okay.  Is there anything else you
18     want to add?
19              MR. WOLF:  Yeah, well, actually, just wanted
20     to add, Footnote 49 in the McDARBY case, which I think
21     sums up everything, and it's on Page -- I guess, 90 --
22     starting 95.
23              THE COURT:  You mean I didn't have to read
24     all this and all you had to do was say to me, Footnote
25     49.
```

MR. WOLF: I tried to before, Your Honor, where you -- and -- and you told me to --
THE COURT: No.
MR. WOLF: -- wait. I start -- I picked it up and you --
THE COURT: I would have liked to --
MR. WOLF: -- said to wait.
THE COURT: -- have gotten Footnote 49 before oral argument.
MR. WOLF: You -- you -- you --
THE COURT: No, I -- I read McDARBY. Okay. Tell me what --
MR. WOLF: Okay. But -- but anyway, the --
THE COURT: -- tell me what you're referring to.
MR. WOLF: -- the point is that I didn't do all the briefing, but I was elected to do the argument. So I did all the reading last night. So like you, Your Honor, I've read this over several times.
THE COURT: Go ahead.
MR. WOLF: And -- and I think this is -- this is dispositive. The jury did not find that Merck committed consumer fraud by using unconscionable commercial practices when marketing Vioxx to prescribing physicians. However, it had found that

Merck had made misrepresent -- had the capacity to mislead concerning the cardiovascular risk. The first sentence is what really is appropriate.
We're talking about the marketing of --
THE COURT: What's the first -- I -- I don't -- I don't follow you, tell me what --
MR. WOLF: What --
THE COURT: -- what's important here?
MR. WOLF: The jury did not find that Merck committed consumer fraud by using unconscionable commercial practices when marketing Vioxx to prescribing physicians. However, it found that Merck had made misrepresentations that had the capacity to mislead concerning the cardiovascular risk of Vioxx, while marketing the drug to prescribing physicians and that Merck had, intentionally, suppressed, concealed, or omitted material information about an association between Vioxx and an increased risk of cardiovascular events from prescribing physicians.
THE COURT: What does that have to do with this?
MR. WOLF: What -- what we ask --
THE COURT: You're saying that there's fraudulent concealment here?
MR. WOLF: No, no, what I -- I think it has

Wolf - Motion                                    44

1    to do with it, Your Honor, is that, ultimately, the
2    question becomes a jury question.  What -- our
3    complaint is strictly seeking damages based on the
4    marketing of meals and failure to disclose something
5    that we -- they're required to do under the Consumer
6    Fraud Act.
7              If a jury believes that, then we win, and it
8    goes to the fact finder.  We're -- we're not arguing
9    that there's anything to do with the relationship
10   between high sodium and disease.  We're arguing that
11   they just had a duty to disclose this, under the
12   Consumer Fraud Act, they didn't disclose it, and our
13   client was damaged because -- under the theories of the
14   Consumer Fraud Act.
15             THE COURT:  And why did they have a duty to
16   disclose?
17             MR. WOLF:  The Consumer --
18             THE COURT:  Because it causes harm.
19             MR. WOLF:  -- Fraud Act --
20             THE COURT:  Because it causes harm.
21             MR. WOLF:  No, because the Consumer Fraud Act
22   has a specific component, 56:8-2.9, 10, and 11, that
23   requires them to put information on their menus to not
24   make the food that they're selling in any respect
25   misleading.  And the fact that there's a lot of -- they

Wolf / Thorpe - Motion                          45

1    don't have to cook with a lot of sodium.  Many
2    restaurants don't, but the fact that they did is
3    prescribed by the Consumer Fraud Act.
4              We -- I believe we get to go to a jury to
5    decide whether that's true or not and -- and -- and I
6    think that footnote is instructive, because that's our
7    claim.  It's purely the marketing of Denny's products
8    without disclosing them.
9              THE COURT:  Okay.  Very good.  Counsel.
10             MS. THORPE:  Your Honor, this is a case, as
11   you have outlined, that contends that the sale of salt
12   cured meats, breakfast foods, and -- and common foods,
13   like eggs, and potatoes, and cheese, is a fraud and --
14   and it violates the Uniform Commercial Code.
15             And the -- as Your Honor correctly described
16   our contentions in your recital, the first argument
17   plaintiffs make is that the Product Liability Act
18   subsumes all of the claims.
19             Responding to what I just heard, Your Honor,
20   there seems to be an effort to detach the allegations
21   regarding harm from salt from -- from the claims that
22   they are making.  And they would have no claim absent
23   some sort of contention of a harm.  So their argument
24   fails on its face for -- for the -- from what we just
25   heard.

Thorpe - Motion                                          46

1         The plaintiff's contentions in their briefing
2    in opposition to our Product Liability Act argument,
3    are that they are pleading only an economic loss.  That
4    kind of argument was, clearly, rejected by the court in
5    -- by the New Jersey Supreme Court in the SINCLAIR
6    case.
7         In SINCLAIR, the plaintiff brought a
8    product's Liability Act claim and a Consumer Fraud Act
9    claim, as Your Honor knows, seeking economic damages.
10   They sought the cost of diagnostic testing.  And the
11   plaintiffs, particularly -- or the court, particularly,
12   notes that the plaintiffs did not seek to recover
13   damages for personal injury.
14        So the court dismissed the Product Liability
15   Act claim, because on its face it requires a physical
16   injury.  And the court then went on to dismiss the
17   Consumer Fraud Act claim, as well, noting that it was
18   clear that the plaintiff was seeking relief for harm,
19   that is, latent or potential heart attack.
20        Just like in this case, in Paragraph 28 of
21   the complaint, where the plaintiffs clearly set out
22   that their -- their allegation is that the -- that the
23   salt -- that there was a failure to warn of the harms
24   that might be caused by the salt content in Denny's
25   food.

Thorpe - Motion                                          47

1         So even though plaintiffs were claiming a
2    truly economic vantage in the SINCLAIR case, the court
3    said that they could not bring a Consumer Fraud Act
4    claim, because the sole remedy in New Jersey for such
5    harm is the Product Liability Act.
6         So the Product Liability Act claim was
7    dismissed for lack of physical injury and the Consumer
8    Fraud Act claim was dismissed by the Product Liability
9    Act was the sole remedy.
10        THE COURT:  I'm familiar with that, Counsel.
11   Why don't we -- why don't you tell me a little bit
12   about your position in terms of the two statutes that
13   they cite to, N.J.S.A. 56:8-2.9 and 56:8-2.10, that the
14   misrepresentation by Denny of food and menus or
15   advertisements of eating establishments and acts
16   constituting misrepresentation of identity of food.
17        MS. THORPE:  Correct.
18        THE COURT:  Okay.  Why don't you tell me a
19   little bit about that?
20        MS. THORPE:  Sure.  Those two statutes do not
21   say, on their face, that, as I'm sure Your Honor is
22   aware, that you have to disclose any particular
23   information on your menu about food.  Rather, they are
24   identity -- they -- they -- they relate to the identity
25   of food.

Thorpe / Wolf - Motion                          48

```
 1              So it would be as if -- if the picture of the
 2    Moons of My Hammy that is on the menu, wasn't want the
 3    plaintiff, actually, got, that's one piece of the --the
 4    case -- of the statute.  And then if there is an
 5    omission that somehow affects the identity of the food,
 6    then that, too, is prohibited.
 7              This -- these statutes, in 2.9 and 2.10, do
 8    not say anything about affirmative information that
 9    must be conveyed in a restaurant menu.  And the
10    plaintiff's all right, at it's core, when you read the
11    briefing, is that there is something wrong with selling
12    french fries with a -- a sandwich that has egg and
13    cheese on it or selling ham and eggs together.  And
14    that cannot -- that -- that that, somehow, is impacting
15    the identity of the foods and that cannot be unlawful
16    conduct, Your Honor.
17              So their argument -- I mean, there's nothing
18    in these statutes that says what they just argued.
19              THE COURT:  Anything else?
20              MR. WOLF:  Yes, Your Honor.  I just -- I just
21    want to make a point.  I mean, the fact that something,
22    potentially, could harm somebody, is not relevant to
23    what -- to the case that we -- we brought.  I believe
24    that we clearly stated our cause of action.  I think --
25    and -- and we pled this case, the case of --
```

Wolf - Motion                          49

```
 1              THE COURT:  How about IN RE:  LEAD PAINT.
 2              MR. WOLF:  -- ELIAS VS. UNGAR'S FOODS
 3    PRODUCT.
 4              THE COURT:  Why don't we -- why don't we look
 5    at IN RE:  LEAD PAINT?  How is this any different from
 6    IN RE:  LEAD PAINT?
 7              MR. WOLF:  It's very different from IN RE:
 8    LEAD PAINT, --
 9              THE COURT:  Tell me.
10              MR. WOLF:  -- because we're not pleading any
11    harm or -- or any -- we're strictly talking about
12    the --
13              THE COURT:  Well, IN RE:  LEAD PAINT didn't
14    claim it, they claim nuisance, but the court found that
15    it was, really, acted as a harm under the Product's
16    Liability Act, no?
17              MR. WOLF:  They did.  I -- I --
18              THE COURT:  So how -- how is this --
19              MR. WOLF:  -- skimmed through and that -- IN
20    RE:  LEAD PAINT.
21              THE COURT:  -- well, IN RE:  LEAD PAINT is --
22              MR. WOLF:  So I didn't --
23              THE COURT:  -- is probably something you
24    should have done more than skim, --
25              MR. WOLF:  Well, I relied on my --
```

Wolf - Motion                                      50

1        THE COURT:  -- because it's -- it's an
2   important case.
3        MR. WOLF:  -- my co-counsel for that, but I
4   -- I read on the cases that -- I did read SINCLAIR and
5   McDARBY, and I read -- and it was abatement of
6   the purchase price case, if I remember.
7        THE COURT:  Well, I'm going to tell you --
8        MR. WOLF:  Yeah, but -- but --
9        THE COURT:  -- what it was, if you want to
10  add something, you can add something.
11       MR. WOLF:  Right, but -- but --
12       THE COURT:  I -- I've read it.
13       MR. WOLF:  The -- I guess the point -- IN RE:
14  LEAD PAINT, SINCLAIR, and McDARBY are inapposite to the
15  claims in this case, and that's why I wanted to just
16  bring to the Court's attention the UNGAR case.  UNGAR
17  was about mislabeling of calorie and fat -- fat
18  content.
19       I know it's a District Court of New Jersey
20  case, but that case, one could make the same arguments.
21  Who cares about calories and who cares about fat?
22  Having too much fat is -- potentially, can cause harm
23  to people.  Eating more calories than you want is,
24  potentially, cause harm to people, but what they did
25  is, they misrepresented the calorie -- the caloric and

Wolf - Motion                                      51

1   the fat content in their products, and it's a Consumer
2   Fraud Act case, it's a misrepresentation.
3        And in this case, our argument is the same as
4   that.  It -- it has nothing to do with the fact that
5   salt can, potentially, cause harm to people.  It's the
6   fact that there's huge amounts of salt in these
7   projects -- products, that they know is in -- and that
8   under the Consumer Fraud Act, they're required to do
9   it.
10       The same way if they used Splenda in their
11  ice tea instead of sugar.  They have -- that -- that's
12  -- it -- it makes it sweet.  People don't know that it
13  has Splenda or sugar, but if they use Splenda, they're
14  required to disclose that.  That would be some type of
15  substitute.  It may, potentially, cause harm to
16  somebody that has an allergic reaction to that, but
17  it's the marketing and the failure to disclose
18  materials parts of products.
19       It's the same as when they serve sour cream
20  on the side, that they use imitation sour cream that
21  had some chemicals in it.  They would be required to
22  disclose, on their menu, that they were using imitation
23  sour cream and not just say sour cream.
24       It -- it's --it's about the marketing of the
25  product and the failure to disclose information that

Wolf - Motion / The Court - Decision                    52

1   they know, that they just don't want to tell people
2   about.  It has nothing to do with the potential harm.
3               THE COURT:  I understand.  Okay.  Pursuant to
4   Rule 462E, a party may file a motion to dismiss for
5   failure to state a claim upon which relief can be
6   granted in lieu of an answer.  Plaintiff's allegation
7   should be examined using a generous and hospitable
8   approach that draws every reasonable inference in favor
9   of plaintiff.  And that's LEON VS. RITE AID, 340 NJ
10  Super 462 at 466, ApDiv 2001.
11              The complaint must be searched in-depth and
12  with liberality to determine if a cause of action can
13  be gleaned, even from an obscure statement,
14  particularly, if further discovery is taken.  Every
15  reasonable inference is, therefore, afforded to
16  plaintiff and the motion granted only in rare instances
17  and, ordinarily, without prejudice.  And that's the
18  PRINTING MART case at 116 NJ 739 at 746.
19              Moreover, a complaint should not be dismissed
20  under this rule where a cause of action is suggested by
21  the facts and a theory of actionability may be
22  articulated by amendments of the complaint.  Defendants
23  assert that even if the facts alleged in plaintiff's
24  complaint are true, plaintiff has failed to plead a
25  cognizable cause of action.


The Court - Decision                         53

1               The first issue that the Court must decide is
2   whether plaintiff's claims are subsumed by the New
3   Jersey Product's Liability Act, which I'm going to
4   refer to as the PLA.  Denny's contends that plaintiff's
5   claims are subsumed by the PLA, as they are, actually,
6   product's liability failure to warn claims brought
7   under the guise of the Consumer Fraud Act, which I'm
8   going to refer to as the CFA.
9               Plaintiff argues that since he did not allege
10  either a personal injury or increase risk of injury,
11  necessitating tort damages, but rather, he sustained
12  economic losses based on his purchase of these meals,
13  Denny's PLA argument is baseless.
14              In 1987, the legislature enacted the PLA
15  based on an urgent need for remedial legislation to
16  establish clear rules with respect to certain matters
17  relating to actions for damages for harm caused by
18  products.  And that's N.J.S.A. 2A 58C-1A.
19              Shortly after the PLA was enacted, the New
20  Jersey Supreme Court declared that the legislature
21  intended to limit the liability of manufacturers so as
22  to balance the interests of the public and the
23  individual with a view toward economic reality.  And
24  that's ZAZA VS. MARGUESS, 144 NJ 34 at 47-48, quoting
25  SHACKIL, 116 NJ 155 at 188.

The Court - Decision                    54

```
 1              Product's liability action is defined as any
 2     claim or action brought by a claimant for harm caused
 3     by a product, irrespective of theory underlying the
 4     claim, except actions for harm caused by breach of the
 5     express warranty.  And that's N.J.S.A. 2A 58C-1B3.
 6     Accordingly, the PLA is the exclusive remedy for harms
 7     caused by a product.
 8              The Supreme Court decision in IN RE:  LEAD
 9     PAINT, 191 NJ 405, 2007, which is recently relied upon
10     by the Court in SINCLAIR VS. MERCK, 104 NJ 51, 2008, is
11     determinative of whether plaintiff's CFA claim is
12     barred by the PLA.  In LEAD PAINT, 26 municipalities
13     and counties sought to recover from manufactures and
14     distributors of lead paints, the cost of detecting or
15     removing lead paint from homes and buildings, providing
16     medical care to residents affected with lead poisoning,
17     and developing programs to educate residents about the
18     dangers of lead paint.  And that's at 408, 409.
19              Although the complaints initially sought
20     recovery through a wide variety of legal theories, the
21     court was called upon to consider only whether the
22     plaintiff had stated a conscionable -- a cognizable
23     claim, based on the common law tort of public nuisance.
24              The Supreme Court held that the PLA
25     encompasses, virtually, all possible causes of action
```

The Court - Decision                    55

```
 1     related to harms caused by consumers and -- by consumer
 2     and other products.  And that's at Page 436 and 437.
 3              The essence of the claims asserted by the
 4     plaintiff in LEAD PAINT was that the defendant failed
 5     to warn of the dangers of lead paint.  Thus,
 6     plaintiffs' exclusive remedy is the PLA.  And that's at
 7     437.  The court noted that harms plaintiff was seeking
 8     to vindicate are addressed in the context of a
 9     product's liability claim.
10              "Were there any doubt about the essential
11     nature of the claims asserted by plaintiffs, a careful
12     reading would demonstrate that they sound in product's
13     liability causes of action.  The central focus of
14     plaintiffs' complaints is that defendants were aware of
15     dangers associated with lead and by extension, with the
16     dangers of including it in paint intended to be used in
17     homes and businesses, and failed to warn of those
18     dangers.
19              "It's classic articulation of tort law
20     duties, that is, to warn of or to make safe squarely
21     within the theories included in the PLA.  In light of
22     the clear intention of our legislature to include all
23     such claims within the scope of the PLA, we find no
24     ground on which to concede -- which to conclude,"
25     rather, "that the claims being raised by plaintiffs
```

1   regarding an ordinary household product, used by
2   consumers, were excluded from the scope of that act."
3   And that's at Page 437.
4           Similarly, in the McDARBY VS. MERCK, the
5   Appellate Division relied upon LEAD PAINT to vacate --
6   to vacate an award of out-of-pocket expenses, treble
7   damages, vis a vis the CFA, because the plaintiff's PLA
8   claims subsumed their CFA claims.
9           With McDARBY involved an appeal from a 15.7
10  million judgment on claims of product liability and
11  consumer fraud arising from Merck's sale of a
12  prescription drug -- prescription drug Vioxx.  The
13  plaintiffs were able to recover additional economic
14  loss pursuant to CFA as a result of Merck's alleged
15  unconscionable commercial practices, deception, fraud,
16  false pretense, false promise, misrepresentation, or
17  the knowing concealments of pressure or omission of a
18  material fact, with intent that others rely upon such
19  concealments of pressure or omission.  That's at 96.
20          In overturning the award, the McDARBY court
21  observed that, "As in LEAD PAINT, plaintiffs' own
22  arguments make it clear that what they are asserting is
23  at it's core, that Merck failed to warn of dangers from
24  a product, which it had knowledge, resulting in alleged
25  economic harm to them."  And that's at Page 97.

1           The court further noted that the, "Essential
2   effect of recognition of a cause of action for the
3   fraudulent withholding of safety information, such as
4   that espoused by plaintiffs pursuant to the CFA, a
5   cause of action that likely would be available to most
6   product liability plaintiffs claiming a failure to warn
7   would be to permit an award of attorneys fees in the
8   majority of product liability actions, without
9   legislative authorization for such relief.  We find no
10  warrant for such action."  And that's at Page 98.
11          Shortly after McDARBY, the New Jersey Supreme
12  Court, again, addressed the issue of whether the CFA is
13  subsumed by the PLA in SINCLAIR VS. MERCK, 105 NJ 51,
14  that's 2008.  In SINCLAIR, the court found that the
15  plaintiff sought to avoid the requirements of the PLA
16  by asserting their claims as CFA claims.  And that's
17  195 NJ at 54.
18          SINCLAIR was a product's liability action in
19  which the plaintiff sought to recover the costs of
20  medical monitoring without alleging a physical injury.
21  The court concluded that "The language of the PLA
22  represents a clear legislative intent that despite the
23  broad reach we give to the CFA, the PLA is paramount
24  when the underlying claim is one for harm caused by a
25  product.

1        "The heart of plaintiff's case is the
2   potential for harm caused by Merck's drug.  It is,
3   honestly, a product's liability claim.  Plaintiff's CFA
4   claim does not fall within an exception to the PLA, but
5   rather, clearly falls within its scope.  Consequently,
6   plaintiffs may not maintain a CFA claim."  And that's
7   at Page 66.
8        In this case, plaintiffs seek class-wide
9   injunctive relief under the CFA and economic losses
10  equal to the amount of money he spent on those meals,
11  that he would not have purchased had the sodium content
12  been properly disclosed to him.  Plaintiff further
13  asserts in his opposing papers that he did not suffer
14  any personal injury or increased risk of physical
15  injury by ingesting foods containing "astronomical"
16  levels of sodium in Denny's meal.
17        So plaintiff's complaint sets forth that,
18  Number 1, "Sodium is the deadliest ingredient in food
19  supply."  And that's the complaint at Paragraph 7.
20        Number 2, "Epidemiologists have found that
21  populations that consume high levels of sodium suffer
22  high rates of hypertension."  And that's Paragraph 8 of
23  the complaint.
24        Number 3, "Experts estimate that reducing
25  sodium levels in processed and restaurant foods by 50

1   percent would save 150,000 lives each year."  And
2   that's the complaint at Paragraph 12.
3        Number 4, "Excessive sodium intake," poses a
4   "grave harm."  And that's the complaint at Paragraph
5   21.
6        Number 5, plaintiff, "Has hypertension."  He
7   takes medication, "To treat his hypertension and high
8   blood pressure."  He is aware, "That he should be on a
9   low sodium diet if he watches his salt intake."  And
10  that's complaint Paragraph 29.
11        Number 6, plaintiff "Would not have purchased
12  Moons over My Hammy or any other high sodium meal if
13  the menu had fully stated the sodium content."  At
14  Paragraph 31.
15        And Number 7, "The amount of sodium in a
16  typical Denny's meal is extraordinarily high, 75
17  percent of Denny's meals contain more than the maximum
18  amount of sodium most American adults should consume in
19  an entire day."  And that's complaint Paragraph 18.
20        Thus, plaintiff's assertion to the contrary,
21  his complaint is replete with allegations that sodium
22  is dangerous and that it causes increased risk of
23  physical injury.
24        Further, a close reading of plaintiff's
25  complaint reveals that the central nature of

The Court - Decision                    60

1    plaintiff's allegations is that despite having
2    knowledge of the detrimental effects of excessive
3    sodium, Denny's continues to market meals containing
4    excessive sodium.
5              In other words, Denny's has misrepresented
6    the safety of its product by failing to warn plaintiffs
7    of its dangers.  It did -- plaintiff, specifically,
8    alleges, "Despite knowledge of the great harm that
9    excessive sodium intake, Denny's continues to market
10   meals filled with excessive sodium."  And that's
11   complaint Paragraph 21.
12             In addition, plaintiff alleges that the
13   information that Denny's does provide regarding the
14   levels of sodium in its meals is inadequate.  Paragraph
15   22 of the complaint states, "Denny's may argue that it
16   does provide nutrition information to New Jersey
17   consumers.  However, the information is only available
18   on-line or in pamphlets at a few restaurants where New
19   Jersey consumers must ask for the pamphlets."
20             This classic articulation of tort law duties,
21   that is, to warn or to make safe is squarely within the
22   theories included in the PLA.  And that's LEAD PAINT,
23   191 NJ at 437.
24             Further, because the core of plaintiff's
25   complaint is that defendant's failed to adequately warn

The Court - Decision                    61

1    the consumers of the dangerous levels of sodium in its
2    meals, plaintiff's remedy appears to be that in a PLA.
3    At least that's in his -- from my reading of
4    plaintiff's complaint.
5              Plaintiff argues at length that the instant
6    case is distinguishable from SINCLAIR and McDARBY
7    because both cases involve claims by persons who
8    ingested the prescription drug Vioxx and then asserted
9    claims based on the actual or increased risk of
10   physical injury suffered as a result of ingesting
11   Vioxx.
12             Plaintiff contends that because he seeks
13   relief based solely upon economic losses he sustained
14   in purchasing, rather than consuming Denny's meals, the
15   CFA should not be subsumed by the PLA.  In support of
16   this position, plaintiff relies on three cases; IN RE:
17   FORD MOTOR COMPANY, which is 66 UCC Reporter Server 2nd
18   726.  ESTATE OF EDWARD KNOSTER, 200 Fed Appx 106 at
19   116.  And STRAWN VS. CANUSO, which is 140 NJ at 43.
20   Each of these cases, this Court finds, is
21   distinguishable from the present case.
22             In IN RE:  FORD MOTOR, involved a
23   consolidated action seeking recovery related to the
24   diminution in value of an automobile.  Ford asserted
25   that the New Jersey plaintiff's warranty claims should

1    be dismissed for failure to allege actual injury.  IN
2    RE:  FORD MOTOR at 44 and 45.  In a footnote, the
3    district court observed that the New Jersey Supreme
4    Court in -- in SINCLAIR, "Dismissed the product's
5    liability claim for failure to allege a physical
6    injury, as required by the statute."
7              Here, plaintiffs do not pursue a PLA claim,
8    in part, because by design, the PLA accepts actions for
9    harms caused by breach of an express warranty, which
10   plaintiffs expressly allege.  Thus, in IN RE:  FORD
11   MOTOR, the court, itself, acknowledged SINCLAIR was
12   distinguishable, because the plaintiffs did not pursue
13   a PLA claim, since an action for breach of express
14   warranty is explicitly exempted.
15             Here, however, plaintiff's CFA claims and
16   breach of implied warranty of merchantability are not
17   expressly exempted.
18             Plaintiff further relies on the DRISSHER
19   (phonetic) court's observations, included in the same
20   footnote, that the, "SINCLAIR'S court also does not
21   mandate dismissal of unjust enrichment in state
22   consumer fraud claims where a party does not plead a
23   PLA claim."
24             However, the plaintiff in SINCLAIR did
25   include a PLA claim.  The SINCLAIR court, ultimately,

1    rejected the plaintiff's attempt to recover medical
2    maintenance damages, holding that medical maintenance
3    damages do not constitute physical injuries under the
4    PLA and that the PLA subsumed plaintiff's CFA claims.
5              To the extent that IN RE:  FORD court
6    suggests that SINCLAIR stands for the opposite
7    proposition, that if plaintiff does not explicitly
8    plead a PLA claim and assert a claim under the CFA.
9    This Court is not bound by dicta contained in a New --
10   New Jersey district court opinion.
11             The ESTATE OF EDWARD KNOSTER is also
12   inapposite to this case.  The ESTATE OF EDWARD KNOSTER
13   involves a car accident that resulted in the death of
14   Mr. Knoster.  Plaintiff's brought a failure to warn of
15   a design claim under the PLA and an additional claim
16   under the CFA to recover damages to the car, itself.
17             The Third Circuit noted that although the
18   PLA, "Effectively creates an exclusive statutory cause
19   of action for claims falling within its purview, claims
20   for physical damage to the product, itself, are not
21   product's liability actions, because the PLA,
22   specifically, excludes such damage from its definition
23   of harm."  And that's at 200 Fed X -- Fed Appx at 115-
24   16.  And that cites N.J.S.A. 58C-1B2.
25             Here, plaintiff does not allege damage to the

The Court - Decision                    64

```
 1      meals he purchased at Denny's.  Therefore, plaintiff's
 2      claims do not fall within the exception relied upon by
 3      the ESTATE OF EDWARD KNOSTER.
 4              Finally, plaintiff relies on the New Jersey
 5      Supreme Court's opinion in STRAWN VS. CANUSO, arguing
 6      that plaintiff's claim should survive because, like the
 7      plaintiff in STRAWN, he is alleging that a seller
 8      concealed material information about a product's health
 9      and safety impact on the product's marketability.
10              Plaintiff contends that under the theory
11      advanced by Denny's, STRAWN'S would have been decided
12      differently.  However, STRAWN, which addressed the
13      developer's duty to disclose a potential buyer the
14      existence of a nearby hazardous landfill, did not
15      involve a product -- within the meaning of PLA.  And
16      the court refers to DEAN VS. BARRETT HOMES, ApDiv 2009.
17              It was Judge Sabatino's concurring opinion
18      where he states, "I have considered -- I have
19      considerable doubt that the legislature intended to
20      treat a single family house as a product when it
21      enacted the PLA."
22              Moreover, assuming that real estate is a
23      product under the PLA, STRAWN was decided pre-LEAD
24      PAINT, pre-McDARBY , and pre-SINCLAIR, and, therefore,
25      it does not address the main issue before the Court,
```

The Court - Decision                    65

```
 1      that is, whether the PLA subsumes plaintiff's CFA
 2      claims.
 3              Ultimately, the Court is not persuaded by the
 4      legal authorities cited by plaintiff to support his
 5      position that, "The PLA has nothing to do with this
 6      case," and that's a quote.  Although McDARBY and
 7      SINCLAIR involve -- involve claims under both the PLA
 8      and the CFA, the Court finds no reason to limit those
 9      holdings to cases involving actions brought under both
10      theories.
11              Moreover, the LEAD PAINT court found that
12      plaintiff's nuisance claim was subsumed by the PLA,
13      despite the fact that plaintiff did not include an
14      underlying PLA count.  And that's at 191 NJ at 409,
15      436-439.
16              Those holdings are consistent with the PLA,
17      which defines a product's liability action to include
18      harms caused by products, "Irrespective of the theory
19      underlying the claim."  N.J.S.A. 2A:58C-1B3.
20              Although neither party addresses the issue,
21      PLA, clearly, subsumes the implied warranty of
22      merchantability, as set forth in the UCC, KOSTER VS.
23      SCOTCH ASSOCIATES, 273 NJ Super 102 at 110.  Citing
24      TIRRELL VS. NAVISTAR, 248 NJ Super 390 at 398, N.J.S.A.
25      58C 1 3.
```

1            The PLA no longer recognizes negligence or a
2    breach of warranty, with the exception of express
3    warranty, as a viable, separate claim for harm.  This
4    is defined in the act caused by a defective product.
5    That's <u>TIRRELL</u>, 248 NJ Super at 398.
6            Under the PLA, harm is defined as personal,
7    physical illness, injury, or death.  N.J.S.A. 2A 58C-
8    1B2.  Again, the PLA defines a product liability action
9    to include harms caused by products irrespective of the
10   theory underlying the claim.  That's N.J.S.A. 2A 58C-
11   13B.
12           Here, the allegations that support
13   plaintiff's breach of implied warranty of
14   merchantability claim are that an ordinary consumer
15   will not reasonably expect to encounter excessive
16   amounts of sodium.  That's Paragraph 58 of plaintiff's
17   complaint.
18           Again, however, the essence of this
19   allegation is that the excessive sodium is harmful.
20   Indeed, in his opposition papers, plaintiff argues
21   that, "Denny's meals are not fit to be consumed and,
22   therefore, unmerchantable, because Denny's meals that
23   contain thousands of milligrams of sodium contribute to
24   the epidemic of hypertension and these meals contribute
25   to a risk factor for preventable death."  And that's,

1    actually, a quote, and that's taken from Page 25 of
2    plaintiff's brief.
3            Plaintiff then goes on to include a litany of
4    organizations that, purportedly, include that high
5    amounts of sodium in food, such as the high amounts of
6    sodium in Denny's meals, can lead to hypertension.
7            Accordingly, as with plaintiff's CFA claim,
8    plaintiff's implied warranty of merchantability,
9    essentially, alleges harms that are subsumed by the
10   PLA.
11           In sum, an indulgent and meticulous
12   examination of plaintiff's complaint reveals that
13   plaintiff's underlying claim is that Denny's failed to
14   warn plaintiff that its meals contain unreasonably high
15   levels of sodium.
16           I do note, and I mentioned this during the
17   course of oral argument, that there is pending
18   legislation before Congress that addresses this issues,
19   specifically, the proposed Meal Act would require the
20   menus include the following information, adjacent to
21   the list of food items; calories, saturated fat, and
22   trans fat, sodium, and percentage daily value.  In
23   addition, the bill would preempt state and local
24   requirements that are in conflict with the federal
25   legislation, but expressly authorize the state and

The Court - Decision                    68

```
 1    local authorities to impose further requirements.  And
 2    that's HR 2426, which is available at government
 3    tracked U.S. Congress.
 4            And I know, although it's not binding on this
 5    Court, the resolution is indicative of a policy debate
 6    that's currently taking place within the federal
 7    government.  Although, that has no bearing on this
 8    Court's determination and how I'm ruling on this
 9    motion.
10            All of Denny's acts that plaintiff alleges in
11    his complaint give rise to his CFA and implied warranty
12    of merchantability claims, in reality, are grounded
13    exclusively in product's liability theories and the
14    Court relies on IN RE:  LEAD PAINT, 191 NJ at 411, to
15    allow plaintiff to proceed with such claims, because
16    plaintiff declined to include a PLA count, would
17    elevate the form over substance and frustrate the
18    mandate of the PLA.
19            For all those reasons, the facts, as alleged
20    in plaintiff's second amended complaint, are
21    insufficient to state claims pursuant to Rule 462E.
22    Plaintiff's complaint is, thereby, dismissed without
23    prejudice to let plaintiff file an amended complaint,
24    if he deems to do so, within 30 days.  If plaintiff
25    fails to file an amended complaint within 30 days of
```

The Court - Decision                    69

```
 1    today's date, the Court will, thereafter, on its on
 2    motion, convert the dismissal without prejudice to a
 3    dismissal with prejudice.
 4            Anything else?
 5            MR. WOLF:  No, Your Honor, thank you very
 6    much.
 7            THE COURT:  Okay.  We'll get you a copy of
 8    the order.
 9            MS. HANDLER:  Thanks.
10            THE COURT:  Thanks.  Do I have the order or
11    do you have the order?  I don't know.  I had a bunch of
12    papers and a disk, too.  We'll get that to you in --
13    just give us two minutes.  I just have to locate it.
14            (Unrelated matter discussed)
15            (Proceedings concluded)
16
17
18
19
20
21
22
23
24
25
```

70

<div style="text-align: right;">70</div>

1
2          CERTIFICATION
3
4      I, Susan M. Cawley, the assigned transcriber, do
5  hereby certify the foregoing transcript of proceedings
6  at the Middlesex County Superior Court, on November 10,
7  2009, Tape No, 1, Index No. from 0024 to 4325, is
8  prepared in full compliance with the current Transcript
9  Format for Judicial Proceedings and is a true and
10 accurate compressed transcript to the best of my
11 knowledge and ability.
12
13
14
15
16  _____          AD/T 427
17  Susan M. Cawley                  AOC Number
18
19  KLJ Transcription Service        November 19, 2009
20  Agency                           Date
21
22
23
24
25